For the appellate defendants, Assistant State's Attorney Michael Gallagher. Morning, Your Honor. I support the affidavit of Michael Rastak. You understand that you have to reserve some time for rebuttal? I do, Justice. Okay. Call the case. Case number 10-3218, Margaret Petraski v. Deborah Thedos.  May it please the Court, Assistant State's Attorney Michael Gallagher on behalf of the appellants. Justices, after a decade of litigation and appeal and two jury verdicts, the trial court reversed its own evidentiary findings, completely disregarded this court's opinion in Petraski 1, and granted plaintiff's motion for a new trial. Well, I have to start out with wondering why you're saying that the trial court disregarded our opinion in the first decision because I thought that opinion was limited to the alcohol evidence and it did come in. It was limited to the alcohol evidence. Judge Burke's and the trial court's opinion on the motion for a new trial was to he said he erred in allowing Dr. Leikin to testify. He erred in allowing Dr. Leikin to testify regarding the average person and what that intoxication was. Did we address the average person matter in our first opinion? You did because that was plaintiff's counsel's argument and why it shouldn't come in. They said that Mr. O'Donnell's opinion was based on an average person. He didn't know how many drinks Margaret Petraski had. He didn't know which drink. I have to stop you right there because what you're saying is that because we decided that the alcohol evidence should come in, that any argument that plaintiff's put forth to exclude that evidence is necessarily overruled. But I don't see the connection. I'm not saying that they couldn't cross-examine Dr. Leikin on the stand. Couldn't they object to that evidence on more nuanced grounds? No, I thought the public court's decision was very explicit. Judge Burke is not exactly a new judge and he's been around a long time and I'm sure he knows how to read our opinions and he read our opinion and said this opinion doesn't tie his hands regarding his ruling on the motion for a new trial and he ruled accordingly. So why are you saying that it was an issue foreclosed in? Well, when he initially denied their motion borrowing Dr. Leikin's testimony, he said he read the opinion four to five times and he said that you explicitly addressed this and he said that all of plaintiff's arguments go to weight, not admissibility. He then changed course and then said that the court's decision of Petraski wasn't explicit on whether Dr. Leikin or Mr. O'Donnell, or any expert for that matter, could testify regarding the intoxication of Margaret Petraski and it wasn't explicit on whether they could testify regarding the intoxication of an average person. But I do believe the court addressed this because in the Petraski opinion, you went through what Dr. or Mr. O'Donnell's opinion was and it was that she was impaired, that she had decreased motor skills, depth perception and you said that based on the known physical fact of Margaret Petraski's blood alcohol level at the time of the accident, coupled with the statutory presumption that an individual with that blood alcohol level above the legal limit is statutorily presumed intoxicated. Those two factors allowed Mr. O'Donnell to testify regarding Margaret Petraski's individual intoxication and the average person's intoxication. And that's one of the problems I have because to go from the individual to the average person, and I understand the plaintiff's argument is quite the contrary, that they're saying it's okay to say the average but not Ms. Petraski. My concern is the average person because who else is sitting in judgment in this case but average jurors? And to the extent that the argument is made that the average person wouldn't have done this if not affected by consumption of alcohol, that sort of I have some discomfort with that because I think it should be limited to the person that is actually litigating the case and whether or not she was impacted by the alcohol, obviously in her bloodstream. I agree and that's what Dr. Likens' opinion was. My concern is that his opinion went beyond that. Beyond her, his opinion went to the average person and then the average person is one of those 12 persons sitting to decide the case. Well actually, plaintiffs conceded in their reply to this appeal that Dr. Likens should be able to testify regarding the average person. But I believe that Dr. Likens was trying to put it in context, saying that 90% of the population that had this blood alcohol level in their system would be in the elimination phase. They would have been over the legal limit and they would have been legally impaired, both their mental and physical faculties. Now, I believe it was more of his attempt to put it in context as opposed to putting the jury in the shoes of Margaret Patrasche and I don't think that was the attempt. I think it was a step that was needed to be taken in order to translate his opinion that Margaret Patrasche individually was intoxicated. I mean, is that the issue intoxicated or is it under the influence of liquor? I mean, there's quite a difference between the two. Well, I understand that the statute, 11-501, talks about under the influence. But I also understand the jury instructions that are put forward as pattern jury instructions. The jury instructions that were before, and I'm objected to in this case, define intoxication. They define an individual that's intoxicated as impaired. And they say that the second jury instruction that follows that directly says the jury is allowed to take that into consideration in determining whether Margaret Patrasche's conduct was a contributory negligence or a contributory negligence to the actual accident. So I understand the court's distinction between the statute and the jury instructions. But I believe it's oranges and oranges and I believe it's addressed through the jury instruction itself. Now, as the same reason why this court allowed Dr. Lykin in order to provide his expert opinion regarding Margaret Patrasche's intoxication at the time of the accident, i.e., it was based on a known physical fact of her blood alcohol level, it was based on a statutory presumption, is the same reason why this court should bar Dr. Morrison's testimony that Officer Theodore's mental state was, she was overreacting to stimuli, I think was the phraseology that she used. Because Dr. Morrison's testimony isn't based on anything contemporaneous. It's not based on any known physical fact. And it's definitely not based on a statutory presumption. It would be akin to allowing Dr. Lykin testifying that Margaret Patrasche was intoxicated because she had been diagnosed, and this is, I'm not saying this is in the record, but diagnosed as an alcoholic. Or she had been in AA a couple weeks before. Or she went to her counselor and said that she had trouble and she had a drink a couple days before the accident. That's what Dr. Morrison is basing her opinion on. It's based on psychiatric notes that occurred weeks, months, years before the accident itself. That above and beyond the fact that her mental state is not relevant when determining reckless or willful wanted conduct. So I think the same reason why you would, or why you did allow Mr. O'Donnell and why you should allow Dr. Lykin's testimony is  regarding the closing arguments. I know this was the third basis that Judge Burke used as far as reversal. He concentrates on about four comments. Three of those four comments, or four of those five comments were not objected to. In fact, they were addressed in rebuttal as well. And first off, I'd ask this Court to apply the same strict application of waiver that you applied to us in that the accident reconstruction plaintiff should not be able to testify that a plaintiff had a turn signal based on the fact that it was too convoluted and it was based in fact. And you said that although we raised it at motion of limiting, you didn't raise it at trial. Let me ask you this. Is that slightly a different issue? Because it's one thing to object on the parties for failure to object during the trial. It's another to say that the trial judge has no discretion to consider whether or not comments were to the point of impacting the jury and influencing its verdict that he felt was contrary to the notions of justice and that's what a trial is aimed to achieve. And so why shouldn't a judge have that sort of discretion to say I think these crossed the line and even though no objection was made, I think they impacted the jury's verdict and as an exercise of my discretion, I'm going to rely on those comments as another basis to grant a new trial. I'm not saying that the trial court does not have discretion. I'm saying that the trial court abused their discretion because the comments in the trial court's opinion didn't even address the fact that they were invited. Now the comments... That's the other thing. I'm glad you brought that up because it's one thing to say that they were invited when there's a response from opposing counsel based on the comments by other counsel. I mean a direct response. If the person says the traffic light was... presumes that the traffic light was green and you say well here's... there's no evidence or you can point to the other witness. A direct response. But your argument seems to be that if they made an emotional plea during the course of their argument about community standards and raised... invoked the concept of children being involved, that we can also start... have our own little vignette about an aunt's death by a DUI driver. And that's more of a tit for tat. I'm not so sure it's something we want to encourage. If you want to respond directly to whatever that story was, that's one thing. But to say that I now have, because they told the story, I now have a right to tell whatever story I want to tell. I understand the court's concern, but the courts have held that an individual, or I'm sorry, a counsel can't put forward an improper argument and then have it be responded to and then claim error. I mean that has been repeatedly held by the appellate courts. And I believe when it talks about the community, it was... the comment was we make judgments about who we want on our road. And that was a direct response to plaintiff's counsel arguing that Margaret Patrasche's blood alcohol was irrelevant. That it was a violation of the statute and nothing more. And it's something that should be reserved for a criminal case or a criminal court, not here. You know, I think you're missing the issue with Justice Garcia is talking about is when you bring in personally that you have an aunt who raised you, who died from a drunk driver. What does that have to do with this case? I mean, that's the problem. That's the kind of conduct that a judge could find totally inappropriate. Well, first and foremost, it's a lone comment after three weeks of jury deliberations at trial. And again, the courts have held that a lone comment in and of itself won't warrant a new trial. More importantly, plaintiff's counsel painted a very vivid picture of his children being buried in sand and equating it to Margaret Patrasche being buried alive. And then tried to place the jurors in the feet, or in the shoes of Margaret Patrasche and imagine how he'd be buried alive for the rest of their lives. Now, defense counsel responded by saying, I have my own family story. And what his attempt was, was to bring the jury back from this rosy picture of, or sympathetic picture of his children, that there are harsh realities. So your claim is he opened the door? I'm saying it was an invited response to his argument. It's an invited response. So is there any limit to such an invited response? That anything is fair game? No, I wouldn't say that anything is fair game. And if he would have made this comment out of the blue and it wasn't invited, then I would say it was improper as well. But I mean, another thing So one cancels out the other, is what you're saying? I'm not saying that his comment was improper, because I would say it was improper if it was not invited. But if the court was determined that an invited comment, albeit improper, a loan comment, should warrant the reversal of a multi-million dollar case after a three-week jury verdict, I think that insults the intelligence of the jury. Judge Burke admonished them, as every trial court does, that argument is not evidence, before and after the argument itself. The jury took consideration and delivered for seven or eight hours over this issue. And they came back with a verdict for the defendants. So they knew from when the first question of Vordier went out, they knew alcohol was involved. And they spent two and a half weeks attacking my officer. And the only alcohol evidence I put on was Dr. Liken. You see, here's a problem. You know, when a trial judge is observing a trial, he's observing the jury. And when a comment is made by a lawyer, that trial judge is looking at the jury to see its effect on the jury and uses its discretion in regard to that. That's the problem that we have, because we have to find an abuse of that discretion. And I understand that. And Judge Burke was there. And he overruled their objection, because he thought it was invited at the time. So I understand that Judge Burke is now taking a different approach, that he believes that that comment in and of itself warrants a new trial. But in the heat of the moment, observing plaintiff's counsel's conduct and argument, observing defense counsel's argument and conduct, and taking into consideration what the jury was hearing, they made their objection. The judge overruled it, because it was an invited response. Well, I guess he felt that he was wrong. That is his opinion. I would say that his opinion, to say that that's lone comment, is a basis for reversal on a three-week jury verdict of $35 million for Cook County, is an abuse of discretion. And the courts have held that a lone comment won't throw away a jury verdict. We've been at this for a long time. And we'd like to see resolution. And we believe the case went in clear. And I invite the court to look at our comments before opening statements and closing arguments. We never tried to paint her as a bad person. We never called her a drunk driver.  But she was there for an hour and a half with the jury. And I saw four of the 12 jurors openly weep at the end of her testimony. I knew we weren't going to win a sympathetic. We could only win on the facts. And that's what we argued. We never tried to paint her as a bad person, because she was a good person. She is a good person. Her family, children that came in to testify, are good people. There wasn't a bad thing about her. So we never tried to attack her as a drunk driver. We never said, send a message. In fact, we never even discussed the damages. So I believe the comments that also that Judge Burke's opinion that we violate a motion and eliminate by placing the jurors in as the taxpayers is not merited. We didn't mention the word taxpayer. I think you want to save some of your time for rebuttal. I appreciate it. Thank you. Good morning, Your Honors. Michael Rasack on behalf of the plaintiff's appellee, Michael Petraschke, who is the guardian of the estate of Margaret Petraschke. The overarching theme of the appeal, and I think the guideline for the Court's opinion, is that we're talking about abuse of discretion on all three of the issues that Judge Burke used to grant the new trial. And each one of the, we've only had two issues. One is the scope of the evidence. The other is the scope of closing arguments. Let's try to maybe narrow it down to two. The middle one. Dr. Morrison. That doesn't seem like an issue or a category that falls under an exercise of discretion. It sounds more like a question of law, whether that sort of evidence should be introduced at all. I would concede that it's a question of discretion for her opinion. I think the county's argument is that you look for facts in the record to trigger or to allow that sort of testimony to be introduced. And here we, I'm not so sure we have any facts to support the introduction of mental health records. Normally the mental health records might have been kept out because of privilege, but it's not like the D.C. versus S.A. case. There's no privilege here because she put them into evidence in her own counterclaim for her own psychiatric injuries. That's how it all started out. That's how we happened to get the records in the first place. Dr. Morrison just didn't opine out of thin air. Dr. Morrison said she looked at all of her treatment records for two years before the accident, going right up to, I believe, days before the accident. And although they won't admit it in their brief, we pointed out in our brief that Dr. Morrison interviewed Deputy Thedos for two and a half hours as part of her examination. I don't know that I've ever seen a case where there's been that much foundation, where the medical person offering the opinion looks at all of my records and then interviews me as part of it and then comes to a conclusion. I would suggest at that point that that's foundation. And Justice Judge Berg. Do you suggest that from now on in all personal injury cases, people's mental health records should be because everybody's got something? Not at all. And the difference here is this is more like the D.C. v. S.A. case because the question specifically here, of course, is why did Deputy Thedos act as she did? This Court said the fact that she did not call in code in the first opinion, that was evidence of her state of mind. Our Courts have held that when it comes to Wilflin-Watt conduct, you need to know the actor's state of mind. That's Kerwin and that's Berg. Both cases refer to that. Her state of mind here was not a normal state of mind. Her state of mind at the time of the accident was one that had a problem. She overreacted. If you'd had some sort of conversation between the Deputy Sheriff and her colleague prior to departing on the call, where she says, you know, I'm going to get that person or I'm going to suggest that there's some sort of connection between her state of mind and introduced into evidence and the eventual incident, that's one thing. She could. What if she had said, I know what it's like to be in a domestic disturbance because that's the background. I'm going to make sure it doesn't happen here. And, Mr. Ransack, the thing is that she never said anything of the kind. No. And it didn't happen. But there is almost no case, for example, in the D.C. v. S.A. case, there was nothing at the scene where there was anything that came out. What came out in the D.C. v. S.A. case were the admissions or statements by the person in treatment long before the accident that they had suicidal ideations. And that led to the question of whether or not the accident was caused because of suicidal ideations. The question here for the jury would have been the fact that I have a definite psychiatric illness. I'm under treatment for it. Dr. Morrison said it was not under control. That's not rebutted. There was no alternative or opposite side. And the doctor says that Ransack would over-respond to a domestic call. And that's arguably what she did here. If you believe what happened as we said it happened. You understand. I mean, I seem to be having a lot of doors open here. And one of the concerns is opening that other door. And the courts have always been very restrictive on mental conditions because, as Justice Gordon said, everybody would try to slip it in. What almost always keeps it out is the therapist's privilege, which almost always applies because it's usually the plaintiff that's at fault and the plaintiff is able to bar it on the basis of the therapist's privilege. Because the plaintiff doesn't, like in D.C. v. S.A., the court said the plaintiff did not raise his or her mental condition. But in this case, we've raised her mental condition. And if the court writes an opinion, the problem I would see it having is when it gets to the point where it would have to say, would have to conclude what plaintiff has to prove. If plaintiff has to prove condition of mind, what better condition of mind could I prove than a psychiatrist who just talked to me weeks before, however long before I testified, and looked at my records and said, Ransack has this condition. If that is the narrow limitation of this Court's ruling, I just would ask what doors would that open? How often is that going to happen? And it would only happen in a situation like this, where the state of mind is so critical. If it's allowed here, it may be allowed in every personal injury case from this point forward. And it should not be if this Court writes a narrow opinion, because it's only being allowed in this case because state of mind is relevant. So it would only, it would never come in. But you can get state of mind in without getting a psychiatrist. You could talk about, I mean, this lady, you know, a jury could look at this and say that she was being a very good police officer in what she was doing. You know, and maybe that's what they found. You could never get this evidence in. This is medical testimony. It could never come in without a doctor behind it. If plaintiff had stood there and said to the judge, to Judge Burke, we want to get this in, and this is what we think these records in the interview means, that never would have been allowed, and I wouldn't be arguing it. We have an interview by the psychiatrist. They have a very specific amount of information. The only doors that would open would be doors specifically where mental condition is that issue. That's only going to be in a Wilf and Wanton case. And only when the person has a psych, not, not, the mental condition is the term they used. She has a definite defined, I forget the name of the book, psychiatric illness that was not under control. That's Morrison's testimony. Unless the court's going to disregard her testimony, keeping in mind that Judge Burke had no problem with foundation. What he had a problem with was he just didn't think it was relevant. But that's the best I can do on that. As to the other points, from the court's questions, I understand, I think we're seeing where the landscape lies on some of the other issues. The real question is, you know, the scope of the trial court's ability to look at these issues. And Justice Gordon said what was in my notes, when you make statements in front of a jury, the judge is the only one who sees what's there. And it sort of mirrors itself in the closing argument. One of the issues, of course, is we didn't object in the closing argument to some of the first statements. If the court reads the entire transcript, this was a trial that, although it was conducted with good vigor, was polite. And even the closing arguments were not bad. They were pretty routine. And all of a sudden, and this court could never see it, there's a pause at the end of defense counsel's closing argument. And I know what happened. He walked back to his table and came back. All of a sudden, at the end of his argument, he unloads all of these voice of the community, society arguments, which have this court has over and over said you can't do. And basically How about his argument that the plaintiff opened the door? The plaintiff never used a voice of the community, a societal judgment. I would suggest to the court that nothing in his argument at all even suggested that. That's simply a different type of issue completely. And surely we never opened the door as to the death of the aunt. I mean, the problem with comments like that is they caught everybody by surprise. It had a terrific impact. It's not in the record. And we don't even know if it's true. I mean, it sounds a terrible thing to say, but I haven't a clue, nor does anybody in that court know what happened that day. But it surely shook everyone up. Basically, what he said was my aunt was killed by a criminal, and the words that hang in the courtroom was just like this, meaning our client. And that might have been enough to close to shift the balance in what is otherwise a very close case. Obviously, we've seen it tried twice, and we've seen it come out with two different outcomes. Unless your honors have further questions, we obviously ask that Judge Burke's findings be sustained. Thank you. Justice, counsel mentioned DC versus SA. And I want to emphasize that that dealt with the discoverability of the evidence, not the admissibility at jury trial. More importantly, what that was was a medical documentation of the plaintiff telling his treater days after the accident that I tried to commit suicide by jumping in front of a car. Now, that deals with the mental state at the time of the incident. If there was a medical document out there from treatment two or three days that Officer Thedos said that I'm a victim of domestic disturbance, I was going to go tell this guy, show this guy something, and that'd be one thing. But that's not what happened. More importantly, we're talking about Dr. Morrison's, the basis for her opinion. Counsel concentrates on the fact that she has a history of domestic disturbance. This is lost in the record. Officer Thedos isn't a victim of domestic disturbance. She isn't a battered wife. She hasn't had espousal abuse. Her history of domestic disturbance is lost. That's what that domestic disturbance is. Also, Thedos' treatment, he talks about this indication of her having issues prior. Well, I would just like to give a quick, quick rundown of her mental evaluations in the months preceding the actual accident itself. February 13, 2001, Dr. Clayton signs a work-to-release form sending her back to work. March 1, 2001, Dr. Goldbolt feels she's better and happier. Goldbolt concludes she's improved. May 10, 2001, Dr. Goldbolt, doing much better, concludes she's improved. March 24, 2001, four days before the accident, Officer Thedos improved per Dr. Goldbolt. And finally, you've got the conduct of Officer Thedos herself, and that's what Dr. Morrison's opinion is based on. She gets the unwanted subject call, possibly ex-wife, beating on the door. Tells Officer Yolanda Collins she's going to respond, puts her lights and sirens on. Even their expert, police procedure expert, acknowledges that it was a domestic disturbance. Sheriff's policy is domestic disturbances are priority ones. They responded to emergencies. She was okay in responding to an emergency. As far as closing argument, we never said voice of community. We never said societal judgment. We never said she was a criminal. And I don't know if counsel was there at closing argument, but I was. And when defense counsel went back to the table, he came back and he said, I forgot to tell you, but I'm going to ask you to send her away with nothing. That's what he said. And when we talk about the actual comments by plaintiff's counsel on opening and close, it was she's put the community at risk. She's risked the lives of her own. Remember, we've read all this. I understand that. And then you can understand the context. Because I don't want to misquote it. Because I believe these briefs have misquoted and mischaracterized it. And you can look at the actual closing argument in itself. And I believe and I agree with counsel wholeheartedly, this case was handled professionally. It was done professionally. It was done clean. And the verdict should stand. Thank you. Well, we have read the briefs. We've read the record. And I think you guys did a very good job of the briefs and the oral arguments. We'll take the case under advisement.